577 F.2d 798
 Walter COX, Plaintiff-Appellee,
v.
FLOTA MERCANTE GRANCOLOMBIANA, S. A., Defendant-Appellant.
 No. 424, Docket 77-7338.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 15, 1977.
Decided May 10, 1978.
 
 Morris Cizner, New York City (Zimmerman & Zimmerman, New York City, of counsel), for plaintiff-appellee.
 Thomas E. Stiles, New York City (Giallorenzi & Stiles, New York City, of counsel), for defendant-appellant.
 Before LUMBARD, MOORE and MULLIGAN, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 Defendant, Flota Mercante Grancolombiana, S.A. ("Flota"), appeals from a judgment against it and in favor of Walter Cox ("Cox"), entered upon a jury verdict in the amount of $75,000, awarded as a result of injuries sustained by him aboard the Ciudad De Cuenca ("Cuenca").
 
 
 2
 In 1972 the Congress, hopeful of resolving the problems created by court-made law in the field of personal injuries to longshoremen working aboard ships, loading and unloading cargo, enacted the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 et seq. The purpose of the amendments was to put at rest (as much as they can ever be) the respective rights and liabilities of shipowners, stevedores and the employees of stevedores, engaged by shipowners to handle the cargo loading and unloading operation. As so frequently happens when new statutes appear, and resourceful and imaginative lawyers are available (and they always are), a multitude of cases have been spawned, thus, in this respect, frustrating the intended purpose of the statute.
 
 
 3
 First, the facts must be stated with some observations believed to be related to the law applicable to them.
 
 
 4
 Cox, a longshoreman, was employed by Universal Maritime Services ("UMS"), a stevedoring company, which had undertaken by contract to unload cargo from the Cuenca. He was not an employee of the Cuenca.
 
 
 5
 On March 31, 1975, Cox was working in the hold ("in the very bottom of the ship"). The hatch above him was open, namely, its cover had been removed. While working, he heard a noise and shortly thereafter was struck by a falling hatch cover which caused his injuries. He did not see the falling hatch cover or know the cause of its fall. As Cox put it "I don't know what happened". (50a).
 
 
 6
 Vincent Maresca was the foreman on the job for UMS. He defined his duties as follows:
 
 
 7
 "The duty of a foreman is to discharge and load the ships and see that everything is safe for the longshoremen to work. And if there isn't I have to tell my hatch bosses, make sure everything is safe, and then I speak to the mate and I tell the mate the same thing." (58a).
 
 
 8
 When the stevedore went in at 8:00 A.M. to commence unloading he (Maresca) said:
 
 
 9
 "I told them (the hatch bosses) to open up the hatches. They get rigged up. I tell them, 'Make sure everything is safe and make sure everything is working right' before they work. And later I tell the mate in charge of the ship, 'Make sure everything is safewise to work'." (62a).
 
 
 10
 The "(o)pening (of) the hatch is done by the crew. Fixing of the booms is done by the men." (63a). As Maresca looked down into the lower hold, he observed that "(j)ust one end was open". (66a). In the morning he had told his hatch bosses, "When they take off the hatch covers make sure the beams are secured and tell the mate to lock them and put the pins in them". (67a). His hatch bosses told him that "they had the locks in place". (68a). However, Maresca, himself, did not consider the lock in itself to be sufficient to hold the beam in place as a safety measure. (69a). He thought that pins were "(m) uch better than the locks they got on the beams" (69a), which indicated to him that the beams "should be locked and pinned" because from his experience he knew that on occasion cargo being brought up from the hatch would strike the beams and boards. (70a). The pins and locks belonged to the vessel. He said, "The pins, the seamen have to do that. That isn't our job". (71a). Maresca knew that "the regulations require that no longshoreman is supposed to work until you make sure that these beams are tied down". (80a). Maresca also said that in the afternoon before the accident "I even told my hatch boss, 'Why didn't you put the pins in them?' He says, 'The crew is going to put them in'." (80a). He further testified "I looked and I told the hatch boss again, 'Get the pins in there, get the pins in the beam.' I told the hatch boss again. Then after I told the hatch boss again in the afternoon, the mate, I said, 'Make sure the pins are in'." (84a-85a).
 
 
 11
 The only other witness was Nicholas Simeone, a hatch boss employed by UMS. Cox was not in his gang. As he described it "there was two gangs that day. One was working in the lower hold and we were in the top deck, in the after end." (90a). Maresca had said to him, "Before you start working make sure the beams are secured", and when he looked he "noticed that the beams were not secured". (92a). The beam was in place and in the slot but "(i)f anything hits it it could fall". (92a). He told a mate several times that the pins were missing and the mate said, "We're going to take care of it". (93a). Simeone did not witness the accident but he saw a beam and hatch covers in the lower hold. On cross-examination he confirmed Maresca's orders saying, "the foreman instructed me to make sure that the beams are secured, you know, see that the beams are secured". (100a). Simeone saw that the beam was not secured. "There was no pin in it". (106a).
 
 
 12
 There was no testimony from any observer as to the cause of the accident, namely, the dislodging and fall of the beam and hatch covers. The closest clue is to be found in Simeone's testimony that "The beam was in place, it was in the slot, but it wasn't if you just touch it it will come up. If anything hits it it could fall". (92a).
 
 
 13
 This, in substance, was plaintiff's case against which the shipowner's motion for a directed verdict and post-trial motion must be judged. As a further ground, the shipowner claims error in the charge and the refusal to give various requests which "permitted the jury to find liability on erroneous legal standards." (Appellant's Br. p. 2).
 
 
 14
 Although in light of the many cases already decided with respect to the 1972 legislation the law is not undeveloped in this field, the trial judge set as his standard Napoli v. Hellenic Lines, 536 F.2d 505 (2 Cir. 1976), saying: "Napoli is this circuit. I am bound by that, aren't I?" (115a) and later "I am not interested in cases outside the Circuit, and Anuszewski is outside the Second Circuit." (118a).[1]
 
 
 15
 The trial court's theory of the action was that the shipowner owed a duty to Cox to make sure that during the stevedoring operation the beams on the upper level were pinned. In short, the ship hence was unseaworthy a theory which might well have been argued before the 1972 LHWCA enactments.
 
 
 16
 The shipowner on the other hand argues that it is not liable to an employee of an independent contractor for injuries sustained as the result of a dangerous condition, latent or open and obvious, known to and within the control of such a contractor.
 
 
 17
 Court's and defense counsel's arguments actually are travelling in parallel lines never to meet. The Court viewed the case as one by a longshoreman vis-a-vis the shipowner; defense counsel as one against the stevedore, who is protected by workmen's compensation and the 1972 Amendments, absent proof the shipowner's negligence as the proximate cause of the accident.
 
 
 18
 The tendency of the law constantly to look for precedential guidance may be at the root of the problem here, but when Congress, by legislation clearly directed at, and attempting to solve, the unseaworthiness-seamen-longshoremen-Sieracki-Ryan problem,[2] has wiped these cases off the judicial slate completely, new writing must be expected to appear. It has.
 
 
 19
 In this Circuit, the reasons prompting the 1972 legislation, the changes it accomplished and the resulting decisions therefrom cannot be better stated than in the opinion of Chief Judge Kaufman, in which Judges Lumbard and Van Graafeiland joined, in Munoz v. Flota Merchante Grancolombiana, S.A., 553 F.2d 837 (1977).[3] There, after decision on motions for a directed verdict at the close of the plaintiff's case and at the close of trial had been reserved, the case was sent to the jury for a special verdict on six questions. The appeal was from the denial of the motions and to set aside the verdict.
 
 
 20
 This Court not only reversed but dismissed the complaint, saying, in part:
 
 
 21
 "It would, in our view, contravene the clear congressional intent and scheme to approve recovery against Grancolombiana in this case. The shipowner had no duty to supervise the minute details of work totally entrusted to the competence of the stevedore. Indeed, commercial reality and applicable union regulations preclude a rule that would require a non-expert constantly to intrude on the work of a master stevedore in the deepest recesses of the ship.
 
 
 22
 A careful consideration of the testimony below has convinced us that Munoz is barred as a matter of law from recovering damages from Flota Merchante Grancolombiana. Moreover, the appellee has not brought to our attention, either in his brief or at argument, any grounds that would warrant a new trial in the event the verdict is set aside by this court, nor are we of the view that such relief would be appropriate. . . . " Munoz v. Flota Merchante Grancolombiana, S.A., 553 F.2d 837, at 840-841 (1977).
 
 
 23
 Following Munoz some three months later, this court had a somewhat similar appeal in Ruffino v. Scindia Steam Navigation Co., Ltd., 559 F.2d 861 (2d Cir. 1977), which affirmed the dismissal of the complaint and the grant of the motion for judgment n. o. v. Judge Van Graafeiland for the Court said:
 
 
 24
 "In enacting the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., Congress intended to relieve shipowners of liability predicated upon the negligence of stevedoring companies. Napoli v. Hellenic Lines, Inc., 536 F.2d 505, 507 (2d Cir. 1976). After the amendment, Congress said, the vessel would be liable only for its own failure to use reasonable care, Munoz v. Flota Merchante Grancolombiana, S.A., 553 F.2d 837, 840 (2d Cir. 1977) which would be determined in accordance with land-based principles of negligence. Napoli, supra at 507." Id. at 862.
 
 
 25
 (Napoli presented a state of facts where the shipowner also acted as its own stevedore.)
 
 
 26
 It makes no difference here whether the alleged defect was latent or open and obvious.[4] In either case, the situation was known to the stevedore. The stevedore from its inception had complete charge of the unloading operation. Only it could give orders to its employees. As said in Munoz (same stevedore, UMS; same shipowner, Flota), "Moreover, union regulations forbade crew members from assuming any role in the enterprise". 553 F.2d at 840. If the beam was dislodged by cargo being hoisted out of the hold (as has been suggested as the only possibility), then the cause of the accident was an operation entirely in the hands of the stevedore. It was the stevedore which had exclusive control of the gangs and how, when and where they worked.
 
 
 27
 This case is quite different on its facts from Lubrano v. Royal Netherlands Steamship Company, 572 F.2d 364 (2d Cir. 1978). In Lubrano, this court reversed a directed verdict and remanded for a new trial an action brought against a shipowner by a longshoreman who had slipped and injured himself while loading slippery drums of tallow. The shipowner, which had a contractual duty to supply dunnage, sought additional dunnage when requested to do so, but plaintiff was injured before the dunnage arrived. The majority opinion determined that in spite of the "ambiguous and unimpressive" evidence, "it was enough to allow a jury to conclude that the ship's officer approved and joined in the direction (of the stevedore) that the men keep working, although the dunnage was not there". Id. at 367. The majority determined that "if there is again evidence that a ship's officer, after being notified of the open and obvious danger of insufficient dunnage for a slippery cargo, had the men keep working or joined in the stevedore's decision to do so, then there would be a jury question". (footnote omitted). Id. at 367. Here there is no indication that the shipowner took any affirmative action to instruct the longshoremen to continue work without the beams being secure, or that he joined in the decision to do so. Likewise there is no indication that the shipowner attempted to remove any part of the loading operation from the control of the stevedore.
 
 
 28
 This case is more similar to Hickman v. Jugoslavenska Linijska Plovidba Rijeka, "Zvir", 570 F.2d 449 (2d Cir. 1978), where this court reversed a jury verdict entered in favor of a plaintiff-longshoreman who was suing the shipowner after he was injured when his foot slipped between bales of rags which he was loading. The longshoreman had complained earlier about a lack of dunnage to the ship's mate, who directed the longshoreman to the location of the dunnage, but the dunnage was insufficient, and he did not ask for more although other dunnage was available. The court determined that the ship did not have a duty as a matter of law to supply dunnage, and "(s)ince the loading operation was not under the control of the shipowner, the mate had no right to interfere with the loading by going down the hatch himself and placing additional dunnage on the bales". Id. at 452. Like Hickman, here the responsibility for the safety of the longshoreman was on the stevedore and it had the responsibility to ensure the pins were in place.
 
 
 29
 The reasons for and the legislative history behind the 1972 Amendments have been rather fully stated in the Third Circuit in Hurst v. Triad Shipping Company, 554 F.2d 1237 (3rd Cir. 1977), cert. denied, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). That court reaffirmed Judge Van Dusen's statement in his opinion in Brown v. Ivarans Rederi A/S, 545 F.2d 854 (3rd Cir. 1976) that
 
 
 30
 "(E)xpress language in the statute and the legislative reports accompanying the 1972 Amendments amply demonstrate that for reasons of policy the major responsibility for the proper and safe conduct of the work was to be borne by the stevedore." (footnote omitted). Id. at 860.
 
 
 31
 In the Fourth Circuit in a case factually almost identical to the case at hand, Anuszewski v. Dynamic Mariners Corp. Panama, 391 F.Supp. 1143 (D.Md.1975), the District Judge entered judgment for the defendant, the facts having disclosed the existence of beams known to the stevedore to have been unpinned. The judge, after noting that the primary duty under 29 C.F.R. § 1918.43(e) (Safety and Health Regulations for Longshoring) with respect to the beams was on the stevedore and that the shipowner should have known of the violation of the regulation, said, "But that negligence on the part of the ship is not actionable negligence in a post-1972 setting, for reasons which are discussed infra." Id. at 1145. This, he said, before the 1972 Amendments "would seemingly have constituted unseaworthiness". Id. at 1146. After reviewing some eight post-1972 decisions that land-based principles applied, referring particularly to §§ 343 and 343A of the Restatement (Second) of Torts, he concluded that "in the context of the facts in this case settled principles of land-based tort law do not impose liability in favor of the employees of an independent contractor for the open and obvious negligence of the person in control of the premises upon which those employees are at work." Id. at 1149. On appeal, the Court of Appeals affirmed, 540 F.2d 757 (1976), cert. denied, 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977), saying that the District Judge's conclusions were "in accord with the decisions of the several courts who have had occasion to consider the 1973 (sic) Amendments." (citations omitted). Id. at 759.
 
 
 32
 Most recently that court in Riddle v. Exxon Transportation Co., 563 F.2d 1103 (4th Cir. 1977) had occasion to review a judgment entered upon a jury verdict in favor of the defendant (an independent contractor) and stated:
 
 
 33
 "In both (Anuszewski, supra, and Bess v. Agromar Line, 518 F.2d 738 (4th Cir. 1975)), we held, in keeping with the manifest legislative purpose, that the Amendments were intended to and did relieve the shipowner of a non-delegable duty to furnish a safe place to work and declared that its liability in a third-party action, in which the stevedore or ship repairer was 'viewed generally as an independent contractor,' was governed by 'land-based' negligence principles and not by 'maritime negligence concepts'." Id. at 1110.
 
 
 34
 The Fifth Circuit, in consolidated appeals Gay v. Ocean Transport & Trading, Ltd. and Guerra v. Bulk Transport Corp., 546 F.2d 1233 (1977), considered at length the effect of the 1972 Amendments and, after citing a host of cases in their and other circuits, including the Second and Fourth, concluded that "(s) ection 905(b) instructs that a longshoreman does not have a cause of action against a vessel if his injury 'was caused by the negligence of persons engaged in providing stevedoring services to the vessel,' " Id. at 1239-40, and affirmed summary judgment in favor of the shipowner and against Gay. In Guerra (possibly as here) a wire attached to a beam snagged on a pallet causing it to fall into the hold, thus injuring Guerra. This operation was under the control of the stevedore. Judgment in favor of the shipowner was affirmed.
 
 
 35
 It is this case to which Chief Judge Kaufman referred when he wrote:
 
 
 36
 "We therefore prefer (obviously to Napoli ) the guidance afforded by Gay v. Ocean Transport & Trading, 546 F.2d 1233 (5th Cir. 1977) where, in two related cases, the Fifth Circuit refused to hold a shipowner liable for injuries sustained by longshoremen as a direct result of their employers' negligence in failing properly to ventilate the hold and omitting adequately to secure pallets on the ship's deck. The court recognized, as we do, that it would be inimical to the intent of Congress to charge the shipowner with the stevedore's wrong. . . . " (citations omitted) Munoz v. Flota Merchante Grancolombiana, S.A., 553 F.2d 837 at 841.
 
 
 37
 It makes no difference in this, the Cox case, whether the defect was latent or open and obvious. In either situation, the potential danger was known to UMS.
 
 
 38
 Following Gay, the Fifth Circuit in Brown v. Mitsubishi Shintaku Ginko, 550 F.2d 331 (5th Cir. 1977), in affirming a summary judgment in favor of the shipowner and against the injured longshoreman, said, "(T)here could be no duty owed by the ship to Brown as a matter of law, even if the ship's crew was aware of the danger posed by the unstable rack". Id. at 335.
 
 
 39
 In view of the law as declared in at least the four circuits herein cited with respect to the changes in the law effected by the 1972 LHWCA enactments and in view of the facts presented in plaintiff's case, the motion for a directed verdict in defendant's favor should have been granted. The stevedore alone had been entrusted with the unloading operation. It knew the location of its employees in the hold; the work being done by the gang above in the 'tween deck area; the necessity, as shown by its directions to the hatch bosses, that the beams be secured and that they were not secured. In addition, the operation of the boom was in its exclusive control and if, as undoubtedly occurred, some object, probably cargo, struck and dislodged the beam, this was the stevedore's act not that of the shipowner. In view of the overwhelming decisional authority and the conclusion therefrom that the shipowner had no duty to supervise the operation entrusted to the stevedore alone, the judgment must be reversed and the complaint dismissed.[5]
 
 
 40
 This result does not impose a hardship or injustice on the injured longshoreman. He receives the substantial[6] benefits intended to be accorded to him by the 1972 legislation. The entire philosophy of workmen's compensation would be thwarted by a contrary result.
 
 
 41
 Although a situation is here presented similar to that in Munoz and Hickman, where this court reversed and dismissed the complaint in each case, brief comment should be made with respect to the trial court's charge and the error claimed therein. The trial court charged:
 
 
 42
 "If you find that because of the untied beams the plaintiff did not have a reasonably safe place in which to work and that the ship's officers knew or in the exercise of reasonable care should have known of the unsafe condition, yet failed to take reasonable steps to correct it, then you should find the defendant liable.
 
 
 43
 Additionally, if you find that the plaintiff did not have a reasonably safe place in which to work, even if you find that the plaintiff or his employer knew of the danger facing him because of the untied beams, or that the danger was obvious to him, you must still find for the plaintiff if you find that the defendant should have anticipated that an accident might occur with the beams not tied down, despite such knowledge on the part of the plaintiff and despite the obviousness of the danger to him." (162a).
 
 
 44
 This charge, in effect, was merely a reiteration of the pre-1972 law which imposed on the shipowner a non-delegable duty to provide the employees of an independent contractor with a safe place to work.[7] It was exactly this legal principle which Congress intentionally changed.
 
 
 45
 Judgment reversed; complaint dismissed.
 
 
 
 [1]
 Congress intended that the LHWCA be applied uniformly nationwide. The Committee Reports accompanying the 1972 Amendments state:
 "Finally, the Committee does not intend that the negligence remedy authorized in the bill shall be applied differently in different ports depending on the law of the State in which the port may be located. The Committee intends that legal questions which may arise in actions brought under these provisions of the law shall be determined as a matter of Federal law." (emphasis supplied). 3 U.S.Code Cong. & Admin.News pp. 4698, 4705 and S.Rep. No. 92-1125, 92 Cong., 2d Sess. 12 (1972).
 
 
 [2]
 Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946) extended the doctrine of strict liability to seamen to include longshoremen on a theory of unseaworthiness. Later, in Ryan Stevedoring Co. Inc. v. Pan Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Court held that the shipowner could recover from the stevedore damages for which the shipowner was held liable. This was based on the theory that the stevedore had breached its implied warranty of workmanlike performance to the vessel
 The problems that these decisions created are indicated in the Committee Reports:
 "The Committee heard testimony that the number of third-party actions brought under the Sieracki and Ryan line of decisions has increased substantially in recent years and that much of the financial resources which could better be utilized to pay improved compensation benefits were now being spent to defray litigation costs." 3 U.S.Code Cong. & Admin.News pp. 4698, 4702 (1972) and S.Rep. No. 92-1125, 92 Cong., 2d Sess. 9 (1972).
 
 
 [3]
 At the time of trial, the trial judge did not have the benefit of the Munoz decision
 
 
 [4]
 After a comprehensive analysis of post-1972 Amendments cases in this field in this and other circuits, Judge Goettel rejected the distinction between latent and obvious defects in two recent cases. Laying the primary safety responsibility on the stevedore, he found no liability where the shipowner did not have actual knowledge of possible unseaworthy conditions which arose after the stevedore began operations. Espinoza v. United States Lines, Inc., 444 F.Supp. 405 (S.D.N.Y.1978) (judgment n. o. v.); Silverio v. Koninklijke Nederl. Stomb. Maats., 444 F.Supp. 415 (S.D.N.Y.1978) (complaint dismissed). Similarly this circuit has recently found that "(t)he dichotomy of latent and obvious defects referred to in the cases is not always controlling or pertinent in determining the liability of the shipowner." Hickman v. Jugoslavenska Linijska Plovidba Rijeka, "Zvir", 570 F.2d 449 (2d Cir. 1978)
 
 
 [5]
 In a New York case, brought by a co-worker of Cox, arising out of the same incident, the State Supreme Court dismissed the complaint based in part on Anuszewski, distinguishing Napoli. The Appellate Division, First Department affirmed without opinion. Williams v. Flota Mercante Grancolombiana, S.A., 400 N.Y.S.2d 616 (1st Dept. App.Div., 1977)
 
 
 [6]
 In Appellant's brief (p. 20) it is represented that "Whereas, prior to the amendment, the longshoremen received a maximum of $70.00 per week in compensation, today the maximum is more than $350.00 per week"
 
 
 [7]
 Appellant requested two charges to the jury which were erroneously denied. (146a). He requested, in request 18, that the shipowner would not be responsible if the plaintiff or his fellow workers were negligent in failing to take adequate precautions to prevent the accident (189a) and in request 21, that the shipowner Flota had no duty to supervise the work of the stevedore UMS. (190a-91a)